UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA

v.

ALSTOM S.A.

CRIMINAL NO. _____

VIOLATION:

15 U.S.C. § 78m(b)(2)(A)
15 U.S.C. § 78m(b)(2)(B)
15 U.S.C. § 78m(b)(5)
15 U.S.C. § 78ff(a)
18 U.S.C. § 2

INFORMATION

The United States charges that, at all times relevant to this Information, unless otherwise specified:

1.      The Foreign Corrupt Practices Act of 1977, as amended, Title 15, United States Code, Sections 78m and 78dd-1, *et seq.* ("FCPA"), was enacted by Congress for the purpose of, among other things, making it unlawful for certain classes of persons and entities to act corruptly in furtherance of an offer, promise, authorization, or payment of money or anything of value to a foreign official for the purpose of assisting in obtaining or retaining business for, or directing business to, any person.  In addition, the FCPA requires every issuer of a security registered with the Securities and Exchange Commission to make and keep books, records, and accounts that accurately and fairly reflect transactions and the distribution of the company's assets. The FCPA also requires issuers to maintain a system of internal accounting controls sufficient to provide reasonable assurances that: (i) transactions are executed in accordance with management's general or specific authorization; (ii) transactions are recorded as necessary to (A) permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (B) maintain accountability for assets;

(iii) access to assets is permitted only in accordance with management's general or specific authorization; and (iv) the recorded accountability for assets is compared with the existing assets at reasonable intervals, and appropriate action is taken with respect to any differences.

<u>Alstom and Other Relevant Entities and Individuals</u>

2.      Alstom S.A. ("Alstom") was headquartered in France.   Alstom was in the business of designing, constructing, and providing services related to power generation facilities, power grids, and rail transportation systems around the world.   During the relevant period, Alstom had sales of approximately €21 billion annually and employed approximately 110,000 employees in over seventy countries.   Shares of Alstom's stock were listed on the New York Stock Exchange until August 2004.  Accordingly, until August 2004, Alstom was an "issuer" as that term is used in the FCPA, Title 15, United States Code, Section 78dd-1(a).  Alstom had direct and indirect subsidiaries in various countries around the world through which it bid on projects to secure contracts to perform power-related, grid-related, and transportation-related services, including for state-owned entities.  Alstom's subsidiaries worked exclusively on behalf of Alstom and for its benefit. Alstom maintained a department called International Network that supported its subsidiaries' efforts to secure contracts around the world.  International Network was organized by regions around the world.  In certain instances, executives of International Network served as presidents of certain Alstom subsidiaries or businesses.  Within Alstom's power sector, the company also maintained a department called Global Power Sales ("GPS"), which performed functions similar to International Network, in that GPS assisted other Alstom entities or businesses in their efforts to secure contracts.

3.      Alstom Power, Inc. ("Alstom Power US") was a subsidiary of Alstom that was headquartered in Windsor, Connecticut, incorporated in Delaware, and thus a "domestic

concern," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1)(B).  Alstom Power US was in the business of providing power generation-related services around the world, including in Indonesia, Egypt, and Saudi Arabia.  At certain times, Alstom's boiler division was run out of Windsor, Connecticut.  At certain times, the head of Alstom's boiler division and the head of boiler sales for Alstom were both assigned to Alstom Power US.

4.      Alstom Network Schweiz AG, formerly known as Alstom Prom AG ("Alstom PROM"), was a subsidiary of Alstom that was headquartered in Switzerland.     Alstom PROM was responsible for overseeing compliance as it related to Alstom's consultancy agreements for many of Alstom's power sector subsidiaries.

5.      Alstom Grid Inc., formerly known as Alstom T&D, Inc. ("Alstom T&D US"), was a subsidiary of Alstom that was headquartered in New Jersey, and thus a "domestic concern," as that term is used in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1)(B).  Alstom T&D US was in the business of providing power grid-related services around the world, including in Egypt.

6.      PT Energy Systems Indonesia ("Alstom Indonesia") was a subsidiary of Alstom that was headquartered in Indonesia.  Alstom Indonesia was in the business of providing power generation-related services in Indonesia.

7.      Lawrence Hoskins ("Hoskins"), who has been charged separately, was an Alstom Area Senior Vice President for the Asia region in Alstom's International Network.  Hoskins' responsibilities at Alstom included overseeing Alstom's subsidiaries' efforts to obtain contracts with new customers and to retain contracts with existing customers in Asia.

8.      Frederic Pierucci ("Pierucci"), who has been charged separately, held various high-level positions and ultimately held an executive-level position as Vice President of Alstom's boiler product line. At certain times, Pierucci was assigned to Alstom Power US and was responsible for overseeing Alstom Power US's efforts to obtain boiler contracts with new customers and to retain boiler contracts with existing customers around the world.

9.      William Pomponi ("Pomponi"), who has been charged separately, was a Vice President of Regional Sales at Alstom Power US. Pomponi's responsibilities at Alstom Power US included obtaining boiler contracts with new customers and retaining boiler contracts with existing customers in various countries, including in Indonesia.

10.     David Rothschild ("Rothschild"), who has been charged separately, was a Vice President of Regional Sales at Alstom Power US. Rothschild's responsibilities at Alstom Power US included obtaining boiler contracts with new customers and retaining boiler contracts with existing customers in various countries, including in Indonesia.

11.     "Alstom Executive A," an individual whose identity is known to the United States, was an executive within Alstom's Compliance Department. At certain times, Alstom Executive A was responsible for overseeing due diligence efforts on prospective sales consultants for Alstom's various power businesses.

12.     "Alstom Executive B," an individual whose identity is known to the United States, worked in Alstom's GPS unit. Alstom Executive B held various executive-level positions within Alstom, including as a high-level executive at Alstom Indonesia and another Alstom entity. Alstom Executive B was one of the people responsible for retaining consultants in connection with Alstom and its subsidiaries' efforts to obtain and retain power contracts in Southeast Asia.

4

13.     "Alstom Indonesia Executive," an individual whose identity is known to the United States, was a high-level executive at Alstom Indonesia. Alstom Indonesia Executive's responsibilities at Alstom Indonesia included assisting other Alstom entities' efforts to obtain contracts with new customers and to retain contracts with existing customers in Indonesia, including assisting Alstom Power US to obtain power projects in Indonesia.

14.     "Alstom T&D US Executive," an individual whose identity is known to the United States, was an executive at Alstom T&D US. Alstom T&D US Executive's responsibilities at Alstom T&D US included overseeing efforts to obtain power grid contracts with new customers and to retain grid contracts with existing customers in various countries around the world, including in Egypt.

15.     "Alstom T&D US Project Manager," an individual whose identity is known to the United States, was the project manager at Alstom T&D US for various projects, including projects in Egypt. Alstom T&D US Project Manager's responsibilities at Alstom T&D US included managing the various grid projects, approving payments to consultants who were purportedly performing services in connection with those projects, and providing certifications to the United States Agency for International Development ("USAID") which funded the projects.

16.     "Consultant A," an individual whose identity is known to the United States, was a consultant who purportedly provided legitimate services on behalf of Alstom, Alstom Power US, and Alstom Indonesia in connection with the bidding of a power project in Indonesia.  In reality, Consultant A was retained for the purpose of paying bribes to Indonesian government officials to obtain or retain business in connection with the power project.

17.     "Consultant B," an individual whose identity is known to the United States, was a consultant who purportedly provided legitimate services on behalf of Alstom, Alstom Power US, and Alstom Indonesia in connection with the bidding of various power projects in Indonesia.  In reality, Consultant B was retained for the purpose of paying bribes to Indonesian government officials to obtain or retain business in connection with the power projects.

18.     "Consultant C," an individual whose identity is known to the United States, was a consultant who purportedly provided legitimate services on behalf of Alstom, Alstom Power US, and other Alstom entities in connection with the bidding of various power projects in Saudi Arabia.   In reality, Consultant C, who was referred to by the code name "Geneva," was the brother of a member of the board of Saudi Arabia's state-owned electricity company and was retained as a means of bribing at least one Saudi government official to obtain or retain business in connection with the power projects.

19.     "Consultant D," an individual whose identity is known to the United States, was a consultant who purportedly provided legitimate services on behalf of Alstom, Alstom Power US, and other Alstom entities in connection with the bidding of various power projects in Saudi Arabia.  In reality, Consultant D, who was referred to by the code name "Paris," was a close relative of a member of the board of Saudi Arabia's state-owned electricity company and was retained as a means of bribing at least one Saudi government official to obtain or retain business in connection with the power projects.

20.     "Consultant E," an individual whose identity is known to the United States, was a consultant who purportedly provided legitimate services on behalf of Alstom, Alstom Power US, and other Alstom entities in connection with the bidding of various power projects in Saudi Arabia.  Consultant E was referred to by the code name "London" and was paid at least $30

million by Alstom in connection with multiple consultancy agreements for the Saudi power projects despite the absence of documentation or proof of legitimate services being performed.

21.     "Consultant F," an individual whose identity is known to the United States, was a consultant who purportedly provided legitimate services on behalf of Alstom, Alstom Power US, and other Alstom entities in connection with the bidding of various power projects in Saudi Arabia.  Consultant F was referred to by the code name "OF" or "Old Friend" and was paid at least $10 million by Alstom in connection with multiple consultancy agreements for the Saudi power projects despite the absence of documentation or proof of legitimate services being performed.

22.     "Consultant G," an individual whose identity is known to the United States, was a consultant who purportedly provided legitimate services on behalf of Alstom, Alstom Power US, and other Alstom entities in connection with the bidding of various power projects in Egypt.  In reality, Consultant G was retained for the purpose of paying bribes to Egyptian government officials to obtain or retain business in connection with the power projects.

23.     "Consultant H," an individual whose identity is known to the United States, was a consultant who purportedly provided legitimate services on behalf of Alstom, Alstom T&D US, and other Alstom entities in connection with various transmission and distribution projects in Egypt.  In reality, Consultant H was retained for the purpose of paying bribes to Egyptian government officials to obtain or retain business in connection with the transmission and distribution projects.

24.     "Consultant I," an individual whose identity is known to the United States, was a consultant who purportedly provided legitimate services on behalf of Alstom and other Alstom entities in connection with the bidding of a power project in the Bahamas.  In reality, Consultant

I was retained for the purpose of paying bribes to a Bahamian government official to obtain or retain business in connection with the power project. Consultant I was a U.S. citizen, was based in the United States, and maintained a bank account in the United States.

Overview of the Unlawful Scheme

*False Books and Records*

25.     During the relevant time period, Alstom, acting through executives, employees, and others, disguised on its books and records millions of dollars in payments and other things of value given to foreign officials in exchange for those officials' assistance in securing projects, keeping projects, and otherwise gaining other improper advantages in various countries around the world for Alstom and its subsidiaries.

26.     In a number of instances, Alstom hired consultants to conceal and disguise improper payments to foreign officials. Alstom paid the consultants purportedly for performing legitimate services in connection with bidding on and executing various projects. In reality, the Alstom personnel knew that the consultants were not performing legitimate services and that all or a portion of the payments were to be used to bribe foreign officials. Alstom executives and employees falsely recorded these payments in its books and records as "commissions" or "consultancy fees."

27.     Alstom also created, and caused to be created, false records to further conceal these improper payments. Alstom created consultancy agreements that provided for legitimate services to be rendered by the consultant, and included a provision prohibiting unlawful payments, even though the Alstom executives and employees involved knew that at times the consultants were using all or a portion of their consultancy fees to bribe foreign officials. Moreover, certain Alstom employees instructed the consultants to submit false invoices and

other back-up documentation reflecting purported legitimate services rendered that those employees knew were not actually performed, so that Alstom could justify the payments to the consultants.

28.    In other instances, Alstom paid bribes directly to foreign officials by providing gifts and petty cash, by hiring their family members, and in one instance by paying over two million dollars to a charity associated with a foreign official, all in exchange for those officials' assistance in obtaining or retaining business in connection with projects for Alstom and its subsidiaries.  As with the consultant payments, Alstom knowingly and falsely recorded these payments in its books and records as consultant expenses, as "donations," or other purportedly legitimate expenses.

29.    Alstom employees, some of whom were located in the District of Connecticut, knowingly falsified Alstom's books and records in order to conceal the bribe payments that they knew were illegal and were contrary to Alstom's written policy.  Alstom also submitted false certifications to the USAID, and other regulatory entities, falsely asserting that Alstom was not using consultants on particular projects when, in fact, consultants were being used, and asserting that no unlawful payments were being made in connection with projects when, in fact, they were.  Various other acts, including e-mail communications, passed through the District of Connecticut.

*Internal Accounting Controls*

30.    During the relevant time period, although Alstom had policies in place prohibiting unlawful payments to foreign officials, including through consultants, Alstom knowingly failed to implement and maintain adequate controls to ensure compliance with those policies.

31.    As further detailed herein, Alstom knowingly failed to implement and maintain adequate controls to ensure meaningful due diligence for the retention of third-party consultants.

A number of consultants that Alstom hired raised a number of "red flags" under Alstom's own internal policies. Certain consultants proposed for retention had no expertise or experience in the industry sector in which Alstom was attempting to secure or execute the project. Other consultants were located in a country different than the project country. At other times, the consultants asked to be paid in a currency or in a bank account located in a country different than where the consultant and the project were located. In multiple instances, more than one consultant was retained on the same project, ostensibly to perform the very same services. Despite these "red flags," the consultants were nevertheless retained without meaningful scrutiny. To the contrary, those submitting consultants for possible retention at times did not make explicit the true reason for the consultants' retention, as well as other relevant facts. And certain executives who had the ability to ensure appropriate controls surrounding the due diligence process themselves knew, or knowingly failed to take action that would have allowed them to discover, that the purpose of hiring the consultant was to conceal payments to foreign officials in connection with securing projects and other favorable treatment in various countries around the world for Alstom and its subsidiaries.

32.     Alstom also knowingly failed to implement and maintain adequate controls for the approval of consultancy agreements. During the relevant time period, Alstom's consultancy agreements provided that payments to the consultants would only be made on a pro rata basis tied to project milestones or as Alstom was paid by the customer. In certain instances, Alstom employees changed the amount and terms of payment for the consultants, in violation of the company's own internal policies, so that Alstom could pay the consultants more money and make that payment sooner in order to generate cash available to bribe the foreign officials. The Alstom executives and employees responsible for approving consultancy agreements did not

adequately scrutinize these changes, and in certain instances were copied on e-mails in which the true purpose for the change was discussed.   During the relevant time period, Alstom also maintained an unwritten policy to discourage, where possible, consultancy arrangements that would subject Alstom to the jurisdiction of the United States.  To effectuate this policy, Alstom typically used consultants who were not based in the United States, and intentionally paid consultants in bank accounts outside of the United States and in currencies other than U.S. dollars.   The Alstom executives and employees responsible for approving consultancy agreements attempted to enforce this unwritten policy even when it meant that the consultant had to open an offshore bank account solely for the purpose of receiving payments from Alstom.

33.     Alstom also knowingly failed to implement and maintain adequate controls for payments to consultants.  In multiple instances, Alstom paid the consultants without adequate, or timely, documentation of the services they purported to perform.  At times, consultants sought help from Alstom to create false documentation necessary for payment approval.   In other instances, the consultants created false "proofs of service" long after the purported services were rendered.   In certain cases described herein, a consultant sought assistance from an Alstom employee responsible for approving payment because, as the consultant explained to the Alstom employee, he did not want to include on his invoices the fact that his services included making unlawful payments.  During the relevant period, Alstom did not engage in auditing or testing of consultant invoices or payments.  In many instances, requests for payments to consultants were approved without adequate review by Alstom knowing that the payments were being used, at least in part, to bribe foreign officials to obtain or retain business in connection with projects in various countries around the world for Alstom and its subsidiaries.

34.     As described herein, Alstom paid approximately $75 million in consultancy fees knowing that this money would be used, in whole or in part, to bribe or provide something of value to foreign officials to secure approximately $4 billion in projects in multiple countries, with a gain to Alstom of approximately $296 million.

Indonesia

35.     Beginning in or around 2002 and continuing to in or around 2009, Alstom, Alstom Power US, Alstom Indonesia, and other Alstom entities attempted to secure various power projects in Indonesia through Indonesia's state-owned and state-controlled electricity company, Perusahaan Listrik Negara ("PLN").  PLN was an "agency" and "instrumentality" of a foreign government, as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-1(f)(1).  One such project was the Tarahan Project, sometimes referred to simply as "Tarahan," a project to provide power-related services to the citizens of Indonesia at approximately $118 million.  Another such project was the Muara Tawar Block 5 Project, a project to expand the existing Muara Tawar power plant and provide additional power-related services to the citizens of Indonesia at approximately $260 million.  In addition, Alstom subsidiaries bid on but were not awarded contracts related to other expansions of the Muara Tawar power plant.  Collectively, these projects were sometimes referred to as "Muara Tawar" or "MT."

36.     In connection with these projects, Alstom disguised on its books and records millions of dollars and other things of value provided to Indonesian officials in exchange for those officials' assistance in securing the power projects for Alstom and its subsidiaries.  Alstom also knowingly failed to implement and maintain adequate controls to ensure that no unlawful

payments were being made through consultants to foreign officials in connection with these projects.

37.     Specifically, Alstom and its subsidiaries retained consultants, including Consultant A and Consultant B, to assist them and their consortium partners in obtaining the contracts for the power projects in Indonesia.   The primary purpose of these consultants was not to provide legitimate services to Alstom, its subsidiaries, and its consortium partners, but was instead to pay bribes to Indonesian officials who had the ability to influence the award of the contracts.  This was known by several executives at Alstom, including at least Hoskins, Pierucci, and Alstom Executives A and B.  Little to no due diligence was completed on these consultants, despite a number of "red flags."  For example, two consultants were retained to perform the same ostensible services, and the terms of payment for Consultant B were front-loaded in violation of Alstom's own internal policies and the original terms of the consultant contract.  Eventually, payments were made to these consultants without adequate supporting documentation, and no testing or auditing was conducted on any of the consultant invoices or payments.

38.     Alstom and its subsidiaries first retained Consultant A in connection with the Tarahan Project in or around late 2002.  Consultant A was to receive a commission based on the overall value that each consortium member would receive from the Tarahan Project contract, from which Consultant A was expected to pay bribes to Indonesian officials, including a high-ranking member of Parliament ("Official 1") and a high-level executive at PLN ("Official 2"). However, through the course of 2003, Alstom personnel came to the conclusion that Consultant A had not sufficiently assured key Indonesian officials at PLN, including members of the evaluation team ("Official 3" and "Official 4"), that he would adequately pay them after the award of the contract.

39.     Accordingly, in or around September or October 2003, Hoskins, Pierucci, Alstom Executive B, and Alstom Indonesia Executive informed Consultant A that Consultant A would be responsible only for paying bribes to Official 1 and that Alstom and its subsidiaries would retain another consultant to pay bribes to PLN officials.  Shortly thereafter, Alstom and its subsidiaries sent Consultant A an amended consulting agreement, reducing the amount of Consultant A's commission to reflect Consultant A's reduced responsibilities and to cover the additional cost of retaining a new consultant.  Alstom then retained Consultant B for the purpose of bribing PLN officials.  Around the same time, Alstom and its subsidiaries also retained Consultant B to bribe PLN officials in connection with their efforts to secure a Muara Tawar Project contract.  As with Consultant A, Alstom did not conduct due diligence on Consultant B.

40.     Alstom together with others took a number of acts to carry out the scheme.  For example, on or about August 8, 2002, an Alstom Indonesia employee sent an e-mail to Rothschild, to which he attached a document explaining, among other things, that Official 1 was a "[k]ey legislator" and "Vice chairman of [the] Parliament commission 8 dedicated for Power & Energy" who had "[e]asy direct access personally to PLN Board" and who could exert "direct influence to PLN ([Official 2] and [another official])" and "utiliz[e] his comission [sic] 8 forum to influence PLN Board" and Ministries.

41.     On or about September 4, 2002, Alstom Indonesia Executive sent an e-mail to Rothschild, copying Pierucci, stating, "[W]e have met [Official 1] to confirm whether he is comfortable with your suggested approach on Representation issue (through [Consultant A])….Again, from my point of view whichever approach taken on the Representation issue, must assure the coverage of Palembang [the city in Indonesia where the evaluation committee was located].  You need to be confident that [Consultant A] could do this since he – being the

14

one who can make the 'commitment' – will have to take over the lead role from us in Palembang."

42.    On or about December 3, 2002, Alstom Indonesia Executive sent an e-mail to Hoskins discussing a Muara Tawar Project, including whether to retain Consultant A in connection with the project, stating, "[Official 1] is a member of INDONESIA Parliament, precisely he is the Vice Chairman of Commission VIII, a commission in charge of handling Power issues….Besides his function in the Parliament, he has long well established relationship with [Official 2] (PLN President Director).  As a Vice Chairman of Commission VIII he certainly have [sic] influence in PLN.   He is not an agent but one of the players….[L]ooking in to [Consultant A's] performance in Tarahan, we need to think twice prior taking him into consideration….As the [Tarahan] project proceed, it shown that [Consultant A] has been unable to fulfil [sic] his tasks and our expectation, he has no grip on PLN Tender team at all. Basically, his function is more or less similar to cashier which I feel we pay too much….As you know, I have set an appointment to meet [Official 2] tomorrow morning to find out who would be his recommended agent, the one that PLN can really feel comfortable with."

43.    On or about December 3, 2002, Hoskins sent an e-mail to an executive at Alstom, stating, "Will call you after I get feedback from [Alstom Indonesia Executive] on his meeting tomorrow with [Official 2].   At this stage [Alstom Indonesia Executive] does not support appointment of [Consultant A] for MT [Muara Tawar] but believes [Official 1] to be an important part of the jigsaw."

44.    On or about January 3, 2003, Alstom Executive A sent an e-mail to Hoskins, copying another executive in Compliance at Alstom PROM, regarding the approval of the consultancy agreement with Consultant A, stating, "[Consultant A] sent me the completed

15

'Agent Profile' for his very small company in Baltimore, Maryland, with branch office in Washington....I understand, that the Tarahan job is boiler supply from the US to Indonesia. As I said before, it would make more sens[e] to have an agent in Indonesia, where [Consultant A's] company has obviously an office. As you know, we do not like to have a US domiciliated company as a consultant, with payment in the US, and most probably in USD."

45.     On or about January 15, 2003, Hoskins responded to the e-mail referenced in Paragraph 44 above, stating, "I talked to [Alstom Indonesia Executive] and his financial controller [] on this subject to establish whether they could implement an agreement locally in Indonesia. They were uneasy about dealing with a local company but thought an arrangement with Singapore may work. [Alstom Indonesia Executive] is going to check with [Consultant A] to see if he has a company in Singapore."

46.     On or about June 5, 2003, Alstom Executive B sent an e-mail to an Alstom Indonesia employee regarding the Muara Tawar Projects and discussing various agents that Alstom could retain in connection with the project, stating, "[Consultant B] basically works for [Official 2]."

47.     On or about August 12, 2003, Consultant A sent an e-mail to Pierucci about another upcoming power project with PLN, stating, "PLN people are upset with us that we told them we only need marginal support from them and now putting everything on them. They are comparing the success fee for Tarahan and [the upcoming project] and asking why they are so much different."

48.     On or about September 18, 2003, Alstom Indonesia Executive forwarded an e-mail to Hoskins describing a meeting between two Alstom employees and two PLN officials, including Official 4, regarding the Tarahan Project which stated, "PLN has expressed their

concerns over our 'agent'.  They did not like the approach made by the agent.  <u>More importantly,</u> <u>they concern whether they can trust on the agent or not in regards to 'rewards' issue</u>.  They concern that if we have won the job, whether their rewards will still be satisfactory or this agent only give them pocket money and disappear.   Nothing has been shown by the agent that the agent is willing to spend money." (emphasis in original).

49.    In or around late September 2003, Hoskins, Pierucci, Alstom Executive B, Alstom Indonesia Executive, and other Alstom employees told Consultant A at a meeting in Indonesia that: (i) they were going to retain another consultant to pay bribes to officials at PLN in connection with the Tarahan Project; (ii) Consultant A needed to pay bribes only to Official 1; and (iii) Consultant A's commission, therefore, would be cut from three percent of the total value of the contract to one percent.

50.    On or about March 3, 2004, Alstom Indonesia Executive sent an e-mail to Hoskins, which was eventually forwarded to an executive in Compliance at Alstom PROM, stating, "Last Monday we sent Tarahan CA [consultancy agreement] to [Consultant B], he immediately feel [sic] cornered after reading the ToP [terms of payment] which said 'prorata'. When I talked to him on the phone I said that I will look at it and I thought it should not be that bad.  I then looked into Tarahan ToP (see attached) and realise that the project payment is spread over 3.5 year!   You would understand why he is worry [sic], he is willing to pre-finance his scope, fulfilling his commitment up-front (prior he get paid) to get the right 'influence', but certainly not waiting 2 to 3 years to get paid while most of his scope is completed in the beginning."

51.    On or about March 30, 2004, Pomponi sent an e-mail to Hoskins, Pierucci, and Alstom Indonesia Executive, stating, "Approval...has finally been received this morning

authorizing the requested Terms of Payment.  Pls proceed with this ASAP to obtain the CA signing by [Consultant B] in order for [Consultant B's] effectiveness to continue."

52.     On or about March 31, 2004, Alstom Indonesia Executive responded to the e-mail from Pomponi referenced in Paragraph 51 above, stating, "I will mentioned [sic] our position to [Official 2] and [Consultant B] this afternoon.  Furthermore I would suggest you to contact [an Alstom employee in Compliance at Alstom PROM] with a request to make the necessary CA changes (ToP) and ask her to send me the revised CA asap.  Once the revised agreement arrived I will obtain [Consultant B's] signature.  Mean while [sic] I will give [Official 2]/[Consultant B] my word."

53.     On or about April 5, 2004, Alstom Indonesia Executive sent an e-mail to Hoskins, copying Pierucci and Alstom Executive B, regarding the Tarahan Project and Muara Tawar Project, stating, "According to [Official 2] Alstom did not show enough its 'commitment' to PLN….[Official 2] also asked me whether for PLN Alstom could use one representative (agent), rather than 2 or 3.  According to [Official 2] in [another project] [Consultant A] was involved. [Official 2] thought he made to Fred [Pierucci] and you clear [Consultant A] was not the right person."

54.     On or about July 12, 2005, an employee at Alstom Indonesia sent an e-mail to Alstom Executive B, Alstom Indonesia Executive, and another Alstom employee regarding the Muara Tawar Block 5 Project,  stating,  "We have built  relationship  [sic] with [Official  4] since the Tarahan [] project.  In this [Muara Tawar Project], we were among those who promoted [Official 4] so that he can become a member of the [Muara Tawar Project] procurement team….Looking at this fact, [Official 4] is of critical importance to us as our vehicle….[Official 4] must be ensured that his effort will be worth his while….We need to set up additional CA

[consultancy agreement], separate from the basic CA currently in place, to cover [Official 4] and his people, as our ammunition to approach working level which is currently untouched by our agent."

55.    On or about September 22, 2006, Alstom Executive B sent an e-mail to another Alstom employee with the subject, "Tarahan – commitment fell thru the cracks," stating, "One of the engineering chaps [Official 4] who had a lot of influence on the outcome of the Tarahan has not been fully compensated on the Tarahan project.  Now he is involved in [the Muara Tawar Block 5 Project] and keeps reminding the boys that we owe him something.  This issue needs to be sorted out ASAP to ensure proper support on [the Muara Tawar Block 5 Project].  According to [an executive at Alstom Indonesia], [Consultant B] has honored his pro rata portion of the commitment.  The original ('other') Agent did not.  I don't know if the other guy has received any consulting fees. Would you be able to check that out with [Alstom] Prom?  If not then we should block the payments until he takes care of the guy."

56.    Alstom and its subsidiaries were ultimately awarded the Tarahan Project and Muara Tawar Block 5 Project contracts and made payments to the aforementioned consultants for the purpose of paying Indonesian government officials, including Official 1, Official 2, Official 3, and Official 4, in exchange for their assistance in securing the Tarahan Project and the Muara Tawar Block 5 Project for Alstom, its subsidiaries, and its consortium partners.  These payments were falsely recorded in Alstom's books and records as "consultancy fees" and "commissions" despite the fact that Alstom employees and executives knew these payments were bribes.

Saudi Arabia

57.     In or around 2000, Alstom completed the acquisition of the worldwide power business of a separate international power company.  Beginning in or around 1998, during the period prior to the acquisition, the separate power company began bidding on power projects in Saudi Arabia and was awarded one such contract.  Beginning in or around 1999, during the period in which Alstom and the other power company operated as a joint venture, and continuing through 2000 after the acquisition of the separate power company was complete, Alstom itself continued bidding on other power projects in Saudi Arabia.  The bids for the power projects in Saudi Arabia were with the Saudi Electric Company ("SEC"), Saudi Arabia's state-owned and state-controlled electricity company, and its predecessor entities.  The SEC, along with its predecessor entities, were "agencies" and "instrumentalities" of a foreign government, as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-1(f)(1).

58.     Projects in Saudi Arabia included different projects at a site known as Shoaiba. The Shoaiba Projects were a series of different projects that resulted in the construction of 14 different steam power generating units for the SEC.  The Shoaiba Projects had several distinct stages and multiple phases within each stage.  In total, the first two stages of the Shoaiba Projects involved the construction of an oil-fired power plant with 11 separate power generating units at a total value of approximately $3 billion.

59.     In connection with the first two of the Shoaiba Projects, Alstom disguised on its books and records tens of millions of dollars in payments and other things of value provided to Saudi officials to obtain or retain business in connection with the projects.  Alstom knowingly failed to implement and maintain adequate controls to ensure that no unlawful payments were being made to these officials.  The arrangements for these consulting agreements originated with

the separate international power company described above.  Subsequently, Alstom honored, continued, and in certain instances renewed these consulting arrangements without adequate diligence on what services were ostensibly being provided by these consultants, whether the consultants were capable of providing such services, whether the agreed upon consultancy fees were commensurate with such legitimate services, and despite the lack of documentation regarding what legitimate services were provided.

60.     Specifically, Alstom, its subsidiaries, and the predecessor entity described above, retained at least six consultants in connection with the first two of the Shoaiba Projects, including all six consultants on the first project.  These six consultants included Consultant C and Consultant D, whose primary purpose was not to provide legitimate consulting services to Alstom and its subsidiaries but was instead to provide benefits to Saudi officials who had the ability to influence the award of the first two power projects to Alstom and its predecessors.

61.     Little to no due diligence was completed on these consultants in the first instance by the separate power company, nor was additional diligence or investigation performed on the consultants after the completion of Alstom's acquisition of the separate power company in 2000. Alstom also knowingly failed to conduct adequate diligence when it executed new consultancy agreements with two of the consultants who had been originally retained by Alstom's predecessor in Saudi Arabia.  This is true despite raising a number of "red flags" described in Alstom's own compliance policies.  The consultancy agreements were executed despite the fact that multiple of the consultants were being retained to perform the same ostensible services. Payments were made to these consultants without adequate supporting documentation, and no testing or auditing was conducted on any of the consultant invoices or payments.

62.     Internal company documents refer to the consultants in code, including names such as "Mr. Geneva" (Consultant C), "Mr. Paris" (Consultant D), "London," "Quiet Man," and "Old Friend."  Consultant C, or "Mr. Geneva," was the brother of a high-level official at the SEC who had the ability to influence the award of the Shoaiba Projects ("Official 5"), which certain Alstom employees knew.  Internal documents reflect that Mr. Geneva was paid approximately $5 million, with no documentation of any legitimate services having been performed by Consultant C commensurate with a $5 million fee and with no documentation of any technical or other expertise justifying such a fee.

63.     Consultant D, or "Mr. Paris," was a close relative of another high-level official at the SEC who had the ability to influence the award of the Shoaiba Projects ("Official 6"), which certain Alstom employees knew.  Internal documents reflect that Mr. Paris was paid at least $4 million, with no documentation of any legitimate services having been performed by Consultant D commensurate with a $4 million fee and with no documentation of any technical or other expertise justifying such a fee.

64.     Consultant E, known as "London," received at least $30 million in fees in connection with multiple consultancy agreements for the first two Shoaiba Projects.  Alstom did not require of Consultant E documentation of what he actually did to justify these sums of money, and what little documentation exists in Alstom's files for Consultant E's services was created after the fact and with the assistance of Alstom employees.

65.     In Saudi Arabia, Alstom hired two consultants at virtually the same time to perform the same ostensible services on the same project. These consultants included Consultant E and Consultant F, referred to as "OF" or "Old Friend."  The agreements, executed on or about May 1, 2002 and October 1, 2002, respectively, both cover ostensible services such as

"establishing contacts," "arranging appointments," "coordinating customer visits," and "making contacts at all necessary levels." As noted above, Alstom paid Consultant E at least $30 million in total fees, and paid Consultant F ("OF") at least $10 million in total fees, with no documentation of any legitimate services having been performed by these consultants commensurate with their fees. Alstom entered into these agreements despite the fact that the duplicative nature of the services, entered into at the same time and on the same project, raised significant red flags.

66.     In addition to paying consultants as a means of bribing key decision makers at the SEC, Alstom and its subsidiaries paid $2.2 million to a U.S.-based Islamic education foundation associated with Official 6. The payments were made in three installments, and internal records at Alstom reflect that these payments were included as expenses related to two of the Shoaiba Projects, rather than as a separate and independent charitable contribution.

67.     Alstom together with others took a number of acts to carry out the scheme. For example, Alstom's lead subsidiary for the Shoaiba Projects tracked the consultant expenses incurred, including those described above, and allocated to each of the internal Alstom consortium members a percentage share of such expenses. On or about January 29, 2002, June 5, 2003, October 7, 2003, and March 15, 2004, Alstom's lead subsidiary for the Shoaiba Projects sent written invoices to Alstom Power US for its percentage share of these consultant expenses.

68.     In or around January 2000, employees of Alstom and its joint venture partner circulated an action plan for bidding on a particular phase of the Shoaiba Projects, which plan included a section entitled "Client History & Perception: Build the Relationship." One column listed key officials at the SEC and a corresponding column provided "Most Important Concerns" as related to the designated officials. One of the key officials listed in the plan was Official 6,

whose close relative was Consultant C, otherwise known as "Mr. Paris."  According to the plan, Official 6 was believed to have "70%" of the decision-making responsibility for SEC matters, including the award of a contract being bid on by Alstom.  As the most important concerns related to Official 6, the plan stated, "Honest reputation.  Son has been known to deal."

69.     Moreover, Alstom knowingly failed to adequately document the full nature of its agreements with its consultants.  On or about September 29, 2000, an employee of Alstom's lead subsidiary sent an e-mail to an Alstom Power US employee, among others, discussing payments to a previously retained consultant whose services had already been rendered, stating, "probably you need to create an agreement for your auditors as done before??   If you need support from our side, let me know."

70.     On or about June 4, 2002, an Alstom employee sent an e-mail to a sales manager at Alstom Power US and several other Alstom employees, stating, "Without entering into more details, we have concluded a principle agreement with the second network so called 'OF' [Old Friend] for [Shoaiba] Stage II Bid.  We have agreed with him to try through his 'system' the 41 wish-item of the feedback that was only partially successful via the network #1.  Please note that both networks believe to be the only one working for this issue."

71.     In addition, on or about August 21, 2003, an employee of Alstom's lead subsidiary working on the Shoaiba Projects sent an e-mail to an Alstom Power US sales manager, stating, "Could you manage to give us some advice [sic] regarding any need to add costs for items such as…Employment of Owner's relatives…Owner's travels, for witnessing tests or for 'other' purposes…?"  The Alstom Power US sales manager forwarded this e-mail to another Alstom Power US employee and a project manager for Alstom Power US, who responded, "This is a significant cost which must be considered in the estimate.  Current royal

decrees (laws) on the subject of Saudization in the Kingdom require that a minimum of 10% of a companies [sic] employees (companies with 10 or more employees) must b[e] Saudi on construction projects like Shoaiba….'Saudization' of course the hammer used by our client to hire Saudis many of whom are strongly recommended by our client, i.e., friends and family. Minimum costs for these guys would be about 10,000 SAR per month including salary, housing, and other living expenses at site…All-in   costs   can   be   as   high   as   $100,000/year depending   on   the   individual's 'qualifications' such as the Consortium's current Site Security Manager….The other problem is that these guys are difficult to lay-off even while ALSTOM's staff is demobilized at the end of the job! Zero productivity may be assumed for any Saudi hire. Make a budget provision!"

72.     On or about December 10, 2003, an Alstom employee sent an e-mail to an employee of Alstom Power US and several other Alstom employees working on the Shoaiba Projects regarding a certificate from SEC that was required for Alstom to get paid by the customer for its work on Stage I, Phase 2 of the Shoaiba Projects, stating, "The importance of timely issue of the [certificate] is, as far as AP [Alstom Power] is concerned, of top priority. Hence, I will support financially, in very confidential bases [sic], those who are supporting me respectively us by removing the unreasonable pre-conditions.   Taking into consideration that nobody has requested any thing from but is solely my idea and intention on behalf of the Consortium.  I will even not mention the Names (Only [two SEC officials] are informed while [another SEC official] will be informed from me confidentially on the telephone).  The total amount of support is Euro 20,000 (50% in Saudi Riyals and 50% in Euro). It is very important that no Site Manager or any body else than the above addresses are supposed to be informed

about this.  It is very Confidential…I need your O.K. for the sharing.  My LN [Lotus Notes e-mail] will be deleted after submission to you."

73.     On or about December 10, 2003, one of the Alstom employees who received the e-mail described in Paragraph 72 above responded, "We agree!"  That same day, another Alstom employee responded, "We confirm our agreement."

74.     In sum, Alstom and its subsidiaries and predecessor companies were awarded the Shoaiba Projects and paid bribes to Saudi government officials, including Official 5 and Official 6, to obtain or retain business in connection with certain of the projects.  Alstom knowingly failed to maintain adequate controls to ensure that no unlawful payments were being made with funds paid to the consultants.  Alstom also knowingly failed to maintain adequate documentation of the consulting arrangements on the Shoaiba Projects, whether as to the legitimate rationale for hiring a particular consultant, the amount of the consultancy fee, or documentation of the otherwise legitimate services that were allegedly to be performed.  No testing or auditing was conducted on the consultants' invoices or payments.  Alstom falsely recorded the payments pursuant to these consulting arrangements in its books and records as "consultancy fees" and "commissions" despite the fact that Alstom knew these payments, in whole or in part, were intended to be bribes and other things of value provided to Saudi officials.

<u>Egypt – Power Projects</u>

75.     Beginning in or around 2002 and continuing to in or around 2011, Alstom and several subsidiaries, including Alstom Power US, began bidding on various power projects with the Egyptian Electricity Holding Company ("EEHC"), the state-owned and state-controlled electricity company in Egypt.  EEHC was an "agency" and "instrumentality" of a foreign government, as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-

1(f)(1). EEHC engaged the services of global power companies to build power stations in Egypt, usually through competitive bids.   One such project was the Nubaria power station, with a value of approximately $70 million.   Another such project was the El Tebbin power station, with a value of approximately $60 million.

76.     However, EEHC was not itself responsible for conducting the bidding on these and other projects, and instead relied on Power Generation Engineering & Service Co. ("PGESCo"), which was controlled by and acted on behalf of EEHC.  PGESCo worked "for or on behalf of" EEHC, within the meaning of the FCPA, Title 15, United States Code, Section 78dd-1(f)(1).

77.     In connection with these projects in Egypt, Alstom disguised on its books and records millions of dollars and other things of value provided to Egyptian officials to obtain or retain business in connection with power projects for Alstom and its subsidiaries.   Alstom also knowingly failed to implement and maintain adequate controls to ensure that no unlawful payments were being made to these officials.

78.     Specifically, in connection with the bidding on these power projects, Alstom retained Consultant G.  Consultant G's primary purpose was not to provide legitimate consulting services to Alstom and its subsidiaries but was instead to make payments to Egyptian officials, including Asem Elgawhary who oversaw the bidding process and who has been charged separately, for the purpose of influencing the award of the contracts.

79.     Little to no due diligence was conducted on Consultant G at the time, despite his raising a number of "red flags" described in Alstom's own compliance policies.  Alstom also deviated from its normal policy of paying consultants on a pro-rata basis (corresponding to each payment that Alstom received from the customer) to change the terms of payment for Consultant

G so that he received a large payment up front, which provided cash to bribe Egyptian officials, including Elgawhary, for the purpose of securing an improper advantage for Alstom and its subsidiaries in connection with the bidding and awarding of power contracts. Alstom also paid invoices submitted by Consultant G despite the absence of a sufficient description of services rendered or backup documentation for those purported services, and no testing or auditing was conducted on any of the consultant invoices or payments.

80.     Alstom and its subsidiaries were ultimately awarded projects in Egypt, including Nubaria and El Tebbin, and made payments to Consultant G for the purpose of paying Egyptian government officials in exchange for their assistance in awarding projects. These payments were falsely recorded in Alstom's books and records as "consultancy fees" and "commissions" despite the fact that a number of Alstom employees and executives knew these payments were bribes.

81.     Alstom together with others took a number of acts to carry out the scheme. For example, on or about July 23, 2003, an Alstom employee sent an e-mail to an Alstom employee in Egypt requesting that the terms of payment for Consultant G be revised to Alstom's standard pro rata payments. In the e-mail, the employee wrote, "[Alstom's office in Paris] would like to see standard terms of payment, i.e. pro rata with the contract, instead of the one as in the keys. Is that a problem with [Consultant G]?"

82.     On or about July 27, 2003, the Alstom employee in Egypt replied, "I called [Consultant G] and he does have a problem due to the coverage required etc. ... You know what I mean ..." (Ellipses in original).

83.     On or about October 27, 2003, an Alstom employee sent an e-mail to a number of employees stating that he had spoken to Consultant G regarding a new power project in Egypt

and that the terms of payment would be the same as with the Nubaria project – "i.e. 50% on down payment, remaining progress."

84.     On or about April 19, 2006, Consultant G sent an e-mail to several Alstom employees requesting payment on an invoice for the Nubaria project.  One of the Alstom employees forwarded the e-mail to another Alstom employee responsible for releasing consultancy payments, stating, "FYI, any update on the agent payment??  Perhaps, this is why our payment from [EEHC] is delayed?"

85.     From 2004 to 2011, Alstom transferred approximately €5 million to Consultant G's bank account in Germany in connection with the Nubaria project, the El Tebbin project, and others, and Consultant G then transferred more than $3 million to bank accounts for the benefit of Elgawhary and another EEHC official.

86.     For example, on or about April 30, 2004, Alstom transferred approximately €467,134 to Consultant G's bank account in Germany.

87.     On or about May 3, 2004, Consultant G then transferred approximately $140,000 to Elgawhary's bank account at Credit Suisse in Switzerland.

88.     On about June 22, 2004, Consultant G transferred an additional $60,000 to a bank account in Maryland that was owned by Elgawhary and the son-in-law of a high-level official at EEHC.

89.     Similarly, on or about May 3, 2007, Alstom transferred approximately €1.1 million to Consultant G's bank account in Germany.

90.     On or about May 4, 2007, Consultant G then transferred approximately €300,000 to Elgawhary's bank account at Credit Suisse in Switzerland.

29

Egypt – Transmission and Distribution Projects

91.    Beginning in or around 2002 and continuing to in or around 2010, Alstom and several subsidiaries, including Alstom T&D US, also began bidding on various grid projects with EEHC and the Egyptian Electricity Transmission Company ("EETC"),  the state-owned and state-controlled electricity transmission company in Egypt.    EETC was an "agency" and "instrumentality" of a foreign government, as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-1(f)(1).  EETC engaged the services of global power companies to build electric grids in Egypt, usually through competitive bids.  One project was the Reactive Power Compensation ("RPC") Project, with a value of approximately $15 million.  Another project was the Three Substations Project, with a value of approximately $30 million.  Both the RPC Project and the Three Substations Project were funded, at least in part, by the United States Agency for International Development ("USAID").

92.    In connection with these two projects, Alstom disguised on its books and records payments and other things of value it provided to Egyptian officials in exchange for those officials' assistance in securing and executing the transmission and distribution projects for Alstom and its subsidiaries.  Alstom also knowingly failed to implement and maintain adequate controls to ensure that no unlawful payments were being made to these officials.

93.    Specifically, in connection with the bidding on the Three Substations Project and the RPC Project, Alstom retained at least three consultants, including Consultant H.  Consultant H's primary purpose was not to provide legitimate consulting services to Alstom and its subsidiaries but was instead to pay bribes to Egyptian officials who had the ability to influence the award of the contracts.  Little to no due diligence was completed on these consultants despite raising a number of "red flags" described in Alstom's own compliance policies.  Alstom deviated

from its normal policy of paying consultants on a pro-rata basis (corresponding to each payment that Alstom received from the customer) and at least on one occasion paid Consultant H prior to receiving a payment from the customer, which Consultant H could then use to bribe Egyptian officials in exchange for their assistance in awarding power contracts to Alstom and its subsidiaries.  Alstom also paid invoices submitted by Consultant H despite the absence of a sufficient description of services rendered or backup documentation for those purported services, and no testing or auditing was conducted on any of the consultant invoices or payments.

94.    Alstom T&D US was required to submit regular certifications to USAID regarding the RPC and Three Substations projects and was required to disclose if Alstom or Alstom T&D US were using any third-party vendors or consultants, state whether Alstom or Alstom T&D US were paying any commissions in connection with the projects, and certify that no unlawful payments were being made.  Alstom T&D US repeatedly submitted false certifications to USAID in connection with these projects, and did not disclose that consultants were being used, that commissions were being paid, or that unlawful payments were being made.

95.    In addition to falsifying records in connection with the retention of consultants and their commission payments, Alstom also falsified its internal records in connection with the provision of money and things of value directly to Egyptian government officials, including "Official 7," a high-level official with decision-making authority on the Three Substations Project and the RPC Project, in exchange for their assistance in awarding the Three Substations Project and the RPC Project to Alstom and its subsidiaries.  Alstom employees paid for entertainment and travel for Official 7 and other key decision-makers at EETC and EEHC, and provided those officials with envelopes of cash and other gifts during such travel.

96.     Alstom together with others took a number of acts to carry out the scheme.  For example, on or about April 23, 2002, an employee of Alstom T&D US sent an e-mail to an employee of another Alstom subsidiary, copying Alstom T&D US Executive and Alstom T&D US Project Manager, stating, "I need to engage you[r] assistance to resolve a critical issue concerning type tests for the several pieces of major equipment on the RPC project....We informed them that our price for equipment was in accordance with US standards which does not require Type Testing performed by independent labs....bottom line they want something??? Money???  I need you to approach [Official 7] to find out what they are looking for to resolve this issue....resolution is critical as we are ready to invoice for delivery."

97.     On or about December 28, 2002, an employee of an Alstom subsidiary sent an e-mail to several individuals at Alstom T&D US, including Alstom T&D US Executive, stating, "As you [k]now [Official 7] will be in the US 31/01/02 till 10/01/03 on a mission for the RPC project; Needless to say that we have to take very good care of the lady with an excellent services for her, especially that she was/is still one of the main support to all of us in the running Project and more importantly in the due – under negotiation 3 X S/St. project....[L]ast time when she was [i]n the US she was complaining that less care was give[n] to her, she even told me that the other trainee[s] who were with her were better hosted."

98.     On or about December 30, 2002, Alstom T&D US Executive responded, "I will make sure that she is taken care of very well.  Either I will personally or if traveling, I will ask [another employee] to see that she is entertained in the best fashion."

99.     On or about December 31, 2002, another employee of Alstom T&D US responded to the same e-mail about Official 7, stating, "We have planned a special weekend in NYC with shopping, sightseeing, dining and tickets to a Broadway Musical.  We are also hopeful

that [Official 7] will be able to resolve the commercial issues that remain unresolved on the RPC Project."

100.   On or about January 27, 2003, an employee of Alstom T&D US sent an e-mail to Alstom T&D US Executive and other Alstom employees, stating, "I want to note that we had an improvement on the margin for this report through claims amendment of 336,000 Euros. However, the margin was impacted by an unexpected commission/fee of $210,000…"

101.   On or about January 28, 2003, Alstom T&D US Executive responded, "I don't understand the point about the unexpected commissions!  These things should be known at the onset of a project and from then on the amounts should be known."

102.   On or about December 2, 2003, after receiving an e-mail from an Alstom finance employee stating that she could not process the invoice for Consultant H because there was insufficient proof of the services provided by Consultant H to justify payment of the invoice, Alstom T&D US Project Manager called the Alstom finance employee and stated that if she "wanted to have several people put in jail [she] should continue to send emails as [she] had earlier in the day" and further instructed her to delete all e-mails regarding the consultant.

103.   On or about December 5, 2003, an Alstom employee sent an e-mail to several Alstom T&D US employees, including Alstom T&D US Executive and Alstom T&D US Project Manager, stating, "I was in Cairo this week and I heard that there is a difficulty on the a.m. project to pay the due commission to [Consultant H] for the first installment (25%).  I confirm that the agreement we have with [Consultant H] correspond[s] to 1.5% of the amount of our contract.  As you already received the down payment and as [Consultant H] performed well for this project, I see no obstacle not to pay asap the invoice they sent you 2 months ago.  We are using this agent for some other T&D [grid] projects, and I don't want to take any risk to

33

jeopardize our chances.  Thus, I kindly ask you to proceed asap on this issue and to keep me informed."

104.    On or about December 8, 2003, Alstom T&D US Executive forwarded the e-mail referenced in Paragraph 103 above to two executives at Alstom, stating, "Can we keep these emails from flying around with this kind of information on it on a USAID project?"

105.    On or about January 27, 2004, Alstom T&D US Project Manager submitted a certification to USAID certifying that no commissions were paid to any agents in connection with the RPC Project.

106.    On or about March 11, 2004, an Alstom employee sent an e-mail to several Alstom executives, stating, "We have the visit today in Levallois of [Consultant H].  Still nothing has been done on this issue.  Please inform me by return on the exact situation.  We are in a bad position for all our other Businesses and thus we need urgent clarification."

107.    On or about March 14, 2004, an Alstom employee forwarded to Alstom T&D US Executive and Alstom T&D US Project Manager the e-mail referenced in Paragraph 106 above, stating, "Can you please let me know what is the situation on this subject?  Last time that we spoke about this subject in January, you were suppose[d] to pay this invoice."

108.    Alstom and its subsidiaries were ultimately awarded the Three Substations Project and the RPC Project and made payments to Consultant H and the other two consultants.  These payments were falsely recorded in Alstom's books and records as "consultancy fees" and "commissions" despite the fact that the payments had been made with the understanding they would be passed on, in whole or in part, to Egyptian officials to obtain or retain business in connection with the projects.  In addition, Alstom's records fail to contain evidence of any

legitimate services being provided by these consultants, and their retention and payment was affirmatively concealed from USAID by Alstom T&D US employees.

The Bahamas

109.    Beginning in or around 1999 and continuing to in or around 2004, Alstom and several subsidiaries began bidding on power projects with the Bahamas Electricity Corporation ("BEC"), the state-owned and state-controlled power company in the Bahamas.  BEC was an "agency" and "instrumentality" of a foreign government, as those terms are used in the FCPA, Title 15, United States Code, Section 78dd-1(f)(1).

110.    Alstom disguised in its books and records payments to Bahamian officials to obtain or retain business in connection with the power projects for Alstom and its subsidiaries. Alstom also knowingly failed to implement and maintain adequate controls to ensure that no unlawful payments were being made to these officials.

111.    Specifically, in connection with the bidding on the power projects, Alstom retained Consultant I who, as certain Alstom employees knew, was a close personal friend of "Official 8" a board member of BEC.  Consultant I's primary purpose was not to provide legitimate consulting services to Alstom and its subsidiaries but was instead to pay bribes to Official 8 who had the ability to influence the award of the power contracts.  Consultant I was a U.S. citizen, was based in the United States, and maintained a bank account in the United States.

112.    Alstom did not perform any due diligence on Consultant I despite the fact that Consultant I raised a number of "red flags" described in Alstom's own compliance policies. Consultant I had no knowledge about, or experience in, the power industry.  Rather, Consultant I sold furniture and leather products, and exported chemical products and spare parts.  Alstom provided Consultant I with the information to include on the invoices he submitted for payment

35

so that there would be appear to be sufficient documentation of purported services rendered to justify payment.  Alstom also paid these invoices despite the absence of backup documentation for the purported services rendered, and no testing or auditing was conducted on any of Consultant I's invoices or payments.

113.    Alstom and its subsidiaries were ultimately awarded the power projects by BEC. Alstom made payments to Consultant I for the purpose of paying Official 8 in exchange for his assistance in awarding the projects to Alstom and its subsidiaries.  These payments were falsely recorded in Alstom's books and records as consultancy fees and commissions despite the fact that a number of Alstom executives knew these payments were bribes.

114.    Alstom together with others took a number of acts to carry out the scheme.  For example, on or about April 25, 2000, Consultant I sent a letter to an employee of an Alstom subsidiary, stating, "Please let me know as soon as possible when you are coming so I can set up a meeting with [Official 8] and I [sic]….If you have figured out what to say on the invoice fax it to me so that I can have the invoice prepared when you arrive."

115.    On or about June 9, 2000, Consultant I issued a check to Official 8 in the amount of $74,229, which was half of the amount that Alstom paid Consultant I two weeks earlier in connection with a power project with BEC.  The check stated in the "For" line: "Commission."

116.    On or about June 27, 2000, Consultant I sent an e-mail to an employee of an Alstom subsidiary regarding a consultancy agreement for a new project at BEC, stating, "As per our conversation of last week you stated I should be receiving the final contract in Miami by today, as of yet it has not yet arrived."

117.    On or about July 4, 2000, Consultant I sent an e-mail to an employee of an Alstom subsidiary, stating, "Tender is Opening on Thursday, [Official 8] has been appointed to

oversee the opening of the tender by the chairman of the board…Also [Official 8] is trying to Speak With The Ministry who is in charge of Immigration.  We also have all our people in place that we discussed.  However I still have no contract.  [Official 8] told me that we are not going to move forward until we have this contract.  You must under stand [sic] we are ready to go and have done all the set up work to get what you need.  But we will not go any further until we have this contract."

118.   On or about July 5, 2000, the Alstom subsidiary employee sent an e-mail to Consultant I in response to the e-mail referenced in Paragraph 117 above, stating, "I have been discussing with the persons involved in this matter and I can confirm that they have accepted the terms and amount agreed with you verbally in Miami.  All the documents will be sent directly to your office in Miami during next week."

119.   On or about July 11, 2000, an employee in Compliance at Alstom sent to Consultant I, copying Alstom Executive A, a draft consultancy agreement for the project with BEC.  The agreement included a provision 7.2 that required the consultant to warrant that he "shall not directly or indirectly divert or pay any amounts to any person, including but not limited to government officials, employees or agents, or use any amounts due hereunder in a manner which may constitute an unlawful or improper payment under any applicable law."  It also contained a provision 10.4 and a provision 10.5 that the agreement would be null and void if the agreement was found to be contrary to the laws of any country or the representations and warranties set forth in the agreement.

120.   On or about July 12, 2000, Consultant I sent an e-mail to an employee of an Alstom subsidiary with the subject, "Contract Amendments," stating, "7.2 [prohibiting unlawful payments] How can I sign this?...10.4 & 10.5 [rendering the contract null and void in the event

of unlawful activity] Due to the nature of how we need to secure what is need [sic], these articles can not be in the contract."

121.   On or about July 14, 2000, Consultant I sent an e-mail to an employee of an Alstom subsidiary, stating, "Please advise progress of amendments to contract....Also [Official 8] would like your word on the other 1/2% we have discussed."

122.   On or about July 21, 2000, the Alstom subsidiary employee sent an e-mail to Consultant I in response to the e-mail referenced in Paragraph 121 above, attaching a revised consultancy agreement and stating that they could not delete the provisions regarding unlawful payments.

123.   On or about July 24, 2000, an employee in Compliance at Alstom sent to Consultant I, copying Alstom Executive A, the finalized consultancy agreement for the project with BEC.

124.   On or about February 8, 2001, Consultant I sent an e-mail to an Alstom employee regarding delays in the award of the contract, stating, "I have [Official 8] going down to BEC Talk with [a high-level official] to try to get a feel for what's going on."

125.   On or about March 1, 2001, an Alstom employee sent a fax to Consultant I, stating, "As per my news, Letter of Acceptance was agreed upon yesterday."

126.   On or about March 20, 2001, Consultant I sent an e-mail to an Alstom employee, stating, "I received a suggested copy of how to invoice your company.  However there is a notation on it that said I should make a notation of what we did with dates etc....Because of the sensitive nature of what we did to help get this contract, I'm not to [sic] happy about spelling out what we did.  [Two Alstom employees] and as well as yourself, know exactly what we did.  So please advice me on this.  We have bent over backwards to all the new technicalities dealing with

Alstom Power....Now I have to take on the expence [sic] and the tax problems our company will have to deal with because of needing to open a Bank account outside the country.  So please help me out with this and let me know how to do the invoice so we get paid."

127.    On or about May 15, 2001, shortly after receiving payment from Alstom, Consultant I issued a check in the amount of approximately $56,000 to Official 8, with the "For" line stating, "Consulting Fee For Alstom Power Contract."

128.    On or about September 24, 2001, shortly after receiving payment from Alstom, Consultant I issued a check in the amount of approximately $42,000 to Official 8, with the "For" line stating, "Commission Alstom Power."

129.    On or about February 19, 2002, shortly after receiving payment from Alstom, Consultant I issued a check in the amount of approximately $42,000 to Official 8.

130.    On or about July 8, 2002, shortly after receiving payment from Alstom, Consultant I issued a check in the amount of approximately $40,000 to Official 8, with the "For" line stating, "Contract."

131.    On or about February 12, 2003, shortly after receiving payment from Alstom, Consultant I issued a check in the amount of approximately $27,000 to Official 8, with the "For" line stating, "Commission Alstom Power."

132.    In total, Alstom paid Consultant I approximately $650,000 in six installments, and Consultant I, in turn, issued six checks to Official 8 for roughly half of that amount in exchange for Official 8's assistance in securing power projects for Alstom and its subsidiaries.

<u>Taiwan</u>

133.    Beginning in and around 2001 and continuing to at least in or around 2008, Alstom and its subsidiaries began bidding on transport-related projects with various entities

responsible for the construction and operation of the metro-rail system in Taipei, Taiwan, including Taipei's Department of Rapid Transit System, known as "DORTS." DORTS was an "agency" of a foreign government, as that term is used in the FCPA, Title 15, United States Code, Section 78dd-1(f)(1).

134.   One project for DORTS was the command and control room ("CCR") project, which had an overall value of approximately $15 million. In connection with the CCR project, Alstom Transport S.A. and Alstom Signaling US each submitted bids on a different aspect of the project. Alstom Transport S.A. proposed to enter into a consulting arrangement with a Taiwan-based company ("Consultant J").

135.   In or around November 2005, when the paperwork for Consultant J was submitted for approval, the documents did not indicate that Consultant J had the requisite expertise in the transport sector. Rather, Consultant J's expertise was listed as a "wholesaler of cigarettes, wines, and pianos."

136.   On or about March 15, 2006, when Alstom compliance personnel questioned Alstom personnel in Taiwan about this submission, Alstom personnel in Taiwan explained that "the main business of [Consultant J] is import. . . . For our business, they are a conduit . . . This is often necessary to ensure compliance with our regulations."

137.   On or about March 16, 2006, when Alstom compliance personnel inquired further about the description of Consultant J as a "conduit," Alstom personnel in Taiwan explained that "this set up has been successful for transport in the past." He continued, "I will be in Paris on 3 and 4 April [and] I can elaborate then."

138.   On or about February 7, 2006, Alstom Transport S.A. formally retained Consultant J on the CCR project.

139.    Although Consultant J did in fact have a history of serving as a consultant in other projects in the transport sector, Consultant J failed to satisfy Alstom's internal policies regarding the necessary qualifications for retention, and in any event, the relevant Alstom employees failed to maintain adequate records documenting the satisfactory resolution of the concerns raised by compliance personnel regarding Consultant J's qualifications.

140.    On the same CCR project, Alstom Signaling US retained a different consultant. However, during the course of the project, Alstom Signaling US also hired Consultant J as a subcontractor, even though Consultant J was already serving as a consultant to Alstom Transport S.A. on the very same project.  No additional diligence was conducted by Alstom Signaling US into Consultant J's adequacy as a subcontractor, and Consultant J's fees as a subcontractor were not subject to Alstom's limitations on the fees that could be paid to consultants.  Alstom Signaling US personnel knew that Consultant J had been retained as a consultant on the CCR project by Alstom Transport S.A.

141.    In total, Alstom paid Consultant J approximately $380,000 in connection with the CCR project.  Alstom knowingly failed to implement a system of internal controls to prevent the retention of Consultant J as a subcontractor, in addition to as a consultant, and otherwise ensure that Consultant J's fees, either as a consultant or as a subcontractor, would not be used to make illegal payments to Taiwanese officials.

142.    Alstom's system of internal controls was inadequate as they related to the Taiwan projects.  Despite numerous red flags, Alstom personnel knowingly failed to conduct further diligence to ensure that payments to its consultants in Taiwan could not be used to make improper payments to Taiwanese officials after the projects were secured.

## COUNT ONE
(False Books and Records)

143.     Paragraphs 1 through 142 are realleged and incorporated by reference as though fully set forth herein.

144.     From in or around 1998, and continuing through in or around 2004, in the District of Connecticut and elsewhere, ALSTOM S.A. knowingly falsified and caused to be falsified books, records, and accounts required to, in reasonable detail, accurately and fairly reflect the transactions and dispositions of ALSTOM S.A., to wit: ALSTOM S.A. knowingly (a) falsely recorded payments as "consultancy fees" and "commissions" knowing that those payments were bribes paid to foreign officials in exchange for those officials' assistance in securing projects for Alstom and its subsidiaries around the world, including in Indonesia, Saudi Arabia, Egypt, and the Bahamas; and (b) falsified records relating to the retention, approval, and payment of consultants in order to conceal the true purpose for retaining and paying the consultants.

All in violation of Title 15, United States Code, Sections 78m(b)(2)(A), 78m(b)(5), and 78ff(a), and Title 18, United States Code, Section 2.

COUNT TWO
(Failure to Implement Internal Controls)

145.    Paragraphs 1 through 142 are realleged and incorporated by reference as though fully set forth herein.

146.    From in or around 1998, and continuing through in or around 2004, in the District of Connecticut and elsewhere, ALSTOM S.A. knowingly failed to implement a system of internal accounting controls sufficient to provide reasonable assurances that: (i) transactions were executed in accordance with management's general or specific authorization; (ii) transactions were recorded as necessary to (A) permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (B) maintain accountability for assets; (iii) access to assets was permitted only in accordance with management's general or specific authorization; and (iv) the recorded accountability for assets was compared with the existing assets at reasonable intervals, and appropriate action is taken with respect to any differences, to wit: ALSTOM S.A. knowingly (a) failed to maintain a sufficient system for the selection and approval of consultants; (b) failed to have procedures in place regarding conducting adequate due diligence on such consultants; (c) failed to require appropriate safeguards when paying the consultants, including failing to conduct appropriate audits of payments to the consultants; (d) failed to have controls in place to prevent payment to multiple consultants for purportedly performing the same tasks on the same projects; (e) failed to have controls in place to prevent large up-front payments to consultants so that all or a portion of the payments could be passed on to foreign officials; (f) failed to have controls in place to prevent direct cash payments to foreign officials, or payments to bank accounts or charities for the benefit of foreign officials; and (g) failed to implement appropriate oversight of

the company's internal accounting controls and compliance program, including oversight of the selection of, and payments to, consultants.

All in violation of Title 15, United States Code, Sections 78m(b)(2)(B), 78m(b)(5), and 78ff(a), and Title 18, United States Code, Section 2.


MICHAEL J. GUSTAFSON
FIRST ASSISTANT U.S. ATTORNEY
DISTRICT OF CONNECTICUT

KATHLEEN MCGOVERN
SENIOR DEPUTY CHIEF
CRIMINAL DIVISION, FRAUD SECTION
U.S. DEPARTMENT OF JUSTICE

DAVID E. NOVICK
ASSISTANT U.S. ATTORNEY

DANIEL S. KAHN
ASSISTANT CHIEF